# United States Court of Appeals
## For the First Circuit

---

No. 14-1989

COLLEEN C. PICCONE; PETER V. QUAGLIA,

Plaintiffs, Appellants,

v.

JOHN W. BARTELS, JR.,

Defendant, Appellee,

DALTON POLICE DEPARTMENT; TOWN OF DALTON,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

---

Before

Howard, Selya, and Stahl,
Circuit Judges.

---

Daniel K. Gelb, with whom Richard M. Gelb, Michelle Iandoli Lamendola, and Gelb & Gelb LLP were on brief, for appellants.
David S. Lawless, with whom Nancy Frankel Pelletier and Robinson Donovan, P.C. were on brief, for appellee.

May 7, 2015

**STAHL, <u>Circuit Judge</u>**. Following an encounter between the parties, Defendant, a local police chief, called Plaintiffs' employer to complain about their behavior during the incident. Plaintiffs filed suit, alleging, inter alia, slander and interference with advantageous business relations. The district court granted summary judgment to Defendant on both counts. We affirm.

## I. Background

Colleen Piccone, a resident of New York, is Deputy Associate Chief Counsel to Customs and Border Protection, part of the United States Department of Homeland Security (DHS). Her boyfriend, Peter Quaglia, is a New York-based special agent with the same agency. In January 2008, the Massachusetts Department of Social Services (DSS) and local police began investigating Piccone's brother, Louis, for alleged child abuse. The state court granted temporary custody of Louis's three children to DSS. Meanwhile, Louis fled the state with his wife and children. Subsequently, the court issued warrants for the parents' arrest.

Piccone applied for temporary custody of her brother's children with the intent of supervising them in the family's Dalton, Massachusetts home. On February 1, 2008, Piccone traveled with Quaglia from New York to Massachusetts to attend a hearing on her application. Before the hearing began, a juvenile court probation officer informed Piccone and Quaglia that someone would

need to install a carbon monoxide detector in Louis's home in order to place the children there in Piccone's care. On counsel's advice, Piccone and Quaglia purchased a detector at a local hardware store and headed to Louis's home to install it before the hearing.

When they arrived, Piccone and Quaglia found two police officers at the house. Defendant John W. Bartels, Jr., chief of the Dalton Police Department, demanded that Piccone and Quaglia identify themselves and told them that they could not enter the dwelling. Piccone presented her driver's license and Quaglia showed his federal identification. After a tense exchange, Bartels called the juvenile court probation officer, who confirmed that Piccone and Quaglia had been told to install a carbon monoxide detector in the home. Bartels returned to Quaglia and told him that he could enter the house and install the detector. Quaglia did so, and then he and Piccone left for the courthouse.

Later that day, Bartels spoke with a state trooper and expressed his frustration that Quaglia and Piccone were "telling everybody what to do. That -- that's what really gets my ass out." The state trooper encouraged Bartels to "[m]ake calls to [the federal agency], get someone fired, do something." Shortly after speaking with the state trooper, Bartels contacted DHS to complain about Plaintiffs' behavior and spoke with Matthew Carbone, an agent with DHS's Office of Inspector General. During their conversation,

-4-

Bartels described his encounter with Plaintiffs at length and told Carbone that he found their conduct unprofessional.[1] After describing how he and his fellow officer asked Plaintiffs for identification and told them that they could not go in the house, Bartels relayed the following information:

> Uh and there was a little bit of a uh an argument. You know things were getting a little agitated here. Uh and [my fellow officer and I] were on a . . . high anxiety level as it was because we've been dealing with this thing for two weeks . . . . But at any rate I told them you're not going in[to the house], period. Uh until we're told by the court that you can. And uh they then um you know obeyed what we said. And they went and sat in their car.

Bartels then explained that he had confirmed Plaintiffs' story about the carbon monoxide detector with the juvenile court probation officer. Carbone replied:

CARBONE:    Ok. So their story did pan out.

BARTELS:    It did.

CARBONE:    It's just that they really weren't too social about it.

BARTELS:    No.  They weren't.

Carbone pointed out that it was "good" for Piccone and Quaglia that they had explicitly told Bartels that they came to the house on a private matter and not on official federal agency business and "just showed [Bartels] their ID, which happened to be government

---

[1] The record includes a transcript and audio recording of the forty-five minute conversation between Bartels and Carbone.

ID."  Carbone also noted that the "story they gave [Bartels] was actually corroborated because they did have the CO detector." Bartels acknowledged those facts, but said:

> Well there were a lot of -- there were a lot of questions as for what authority we had.  Um you know and well I -- I -- it seemed like they didn't feel that we had the authority to tell them no you're not going into the house . . . .  And not knowing who they were.  I mean it was just kind of more of a hassle than we needed to go through.

Bartels expressed his view that Plaintiffs could have "ma[de] things a little bit easier on us" so that the officers didn't have to "increase" their "level of aggression."  Carbone replied:

> CARBONE:    Uh clearly unprofessional conduct on their -- on their part uh.
>
> BARTELS:    On that level yes.  Now to uh um Mr. Quaglia's credit, he apologized at the end of all this.
>
> CARBONE:    Ok.
>
> BARTELS:    Uh and he said . . . we're at a high stress level. . . . He drove all night to get here. . . .
>
> CARBONE:    Mm hm.
>
> BARTELS:    Uh and uh uh I can understand that.  And I uh told him that.  I said listen, I know things are --  things are at a fever pitch right now.  But we don't need to go through this type of stuff because it just makes matters worse.
>
> CARBONE:    Right.
>
> BARTELS:    Uh so um all in all they left in an amicable fashion.  I didn't have any further conversation with Ms. Piccone because

after the initial conversation, she went into the car, I never spoke with her again.

Bartels went on to note that the situation "was kind of defused" when his fellow officer "cool[ed] [Plaintiffs] down" and Quaglia apologized.

Midway through the conversation, Carbone inquired, "did you guys believe that . . . Quaglia or Colleen knew where the parents were?" Bartels replied that the officers "didn't ask them specifically" but pointed out:

> I can't believe -- they've been involved in this thing since the get-go. And I believe it was Colleen's house . . . which was searched by NYPD and that was -- hell, that was back on the twenty-fifth of this month -- or of last month. So not to know that there are warrants, I don't know.

Carbone then asked, "Is it fair to presume that she probably knows where they are, she's trying to get the . . . foster or adoption paperwork done so that she can amicably take custody of the kids and then the parents would turn themselves in?" Bartels replied in the affirmative: "I think that's their motive. Uh I think they want to uh get the kids situated. And then let uh the parents uh you know deal with their criminal charges here."

Carbone then said that he originally had the impression that Piccone and Quaglia were "[p]urposely hiding stuff" and "[n]ot being cooperative" with law enforcement, but told Bartels, "the fact that you guys didn't [pressure Plaintiffs to identify the location of the kids and parents] in the driveway with them leads

-7-

me to believe" that "it's not that -- that type of an emergency." Carbone signaled that it would "definitely [have been] a [Customs and Border Protection] policy violation" if Quaglia and Piccone either had "misrepresent[ed] that they're there for immigration reasons and they weren't" or "thwart[ed] law enforcement from finding a fugitive." Bartels clarified, "No that -- that didn't happen."

Bartels acknowledged again, "I don't know that there's an emergency" but told Carbone, "[t]he more I rattle that family's tree -- . . . . [t]he better I'm going to feel." He reiterated his displeasure with what he viewed as Piccone and Quaglia's lack of "professional courtesy" during the interaction: "yeah, you know, I'm not with the Department of Homeland Security and yeah, I don't have the connections you do, but goddamn it, I'm a cop just like you are." Shortly after, Carbone asked whether Bartels "kn[ew]" that Quaglia and Piccone were aware that the state had issued arrest warrants for Louis and his wife. Bartels responded, "No I don't know that," and then continued, "[b]ut I'm assuming that they know where [the family members] are, only because they're here trying to help get . . . custody" of the children.

Toward the close of the phone call, Carbone noted that he was hesitant to "ratchet [the investigation] up another level" if "the law enforcement authority that's actually looking for the parents didn't ask [Plaintiffs] those tough questions" about the

missing family's whereabouts.  Bartels confirmed that he did not need Carbone to initiate an emergency investigation and concluded:

> And I'm not looking uh for heads to roll.  Uh I'm just looking to you know say hey where are they.  Uh evidently the courts didn't -- didn't push the issue.  Uh and we didn't push the issue up at the house. . . .  [M]aybe communications wasn't [sic] the best uh on our part between the police department and the courts. . . .  In fact I wish the damn uh courts had called us to begin with to let us know.  Say hey there's going to be people up at the house. . . .  Then we wouldn't be having this conversation right now.

As a result of Bartels's telephone call, DHS launched investigations into Piccone and Quaglia's conduct.  Ultimately, DHS took no action against either plaintiff.

Plaintiffs filed suit in district court,[2] alleging slander and libel; malicious falsehood; interference with advantageous business relations ("IABR"); violation of Massachusetts's right to privacy statute, Mass. Gen. Laws ch. 214, § 1B; and intentional infliction of emotional distress.  The district court allowed Defendant's motion to dismiss as to all but the slander and IABR claims.  Piccone v. Bartels, No. 11-cv-10143-MLW, 2012 WL 4592770, at *12 (D. Mass. Sept. 29, 2012).  After a hearing, the district court granted summary judgment to Defendant

---

[2] Plaintiffs also filed suit against the Dalton Police Department and the Town of Dalton, but later amended their complaint, leaving Bartels as the sole defendant.

on the two remaining counts.  Piccone v. Bartels, 40 F. Supp. 3d 198, 201 (D. Mass. 2014).  This appeal followed.

## II. Analysis

We afford summary judgment decisions in defamation cases de novo review.  Yohe v. Nugent, 321 F.3d 35, 39 (1st Cir. 2003).  On appeal, Plaintiffs challenge two categories of statements made by Defendant: first, that Plaintiffs acted unprofessionally, and second, that they may have had knowledge regarding the location of the absent parents and/or children.  We conclude that neither category is actionable under Massachusetts defamation law.

The Supreme Court has recognized "constitutional limits on the type of speech which may be the subject of state defamation actions."  Milkovich v. Lorain Journal Co., 497 U.S. 1, 16 (1990).  Because defamation requires a false statement at its core, opinions typically do not give rise to liability since they are not susceptible of being proved true or false.  E.g., Veilleux v. Nat'l Broad. Co., 206 F.3d 92, 108 (1st Cir. 2000); Phantom Touring, Inc. v. Affiliated Publ'ns, 953 F.2d 724, 727 (1st Cir. 1992) (quoting Milkovich, 497 U.S. at 21).  As Massachusetts case law observes, "[i]n the defamation context, an expression of 'pure opinion' is not actionable."  HipSaver, Inc. v. Kiel, 464 Mass. 517, 526 n.11 (2013).  Thus, a statement cannot be defamatory if "'it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than

-10-

claiming to be in possession of objectively verifiable facts.'" Gray v. St. Martin's Press, Inc., 221 F.3d 243, 248 (1st Cir. 2000) (quoting Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir. 1993) (Posner, J.)).

Merely couching a statement as an opinion, however, will not automatically shield the speaker from liability where the statement implies the existence of underlying defamatory facts. Milkovich, 497 U.S. at 18–19; see also Restatement (Second) of Torts § 566 (1977) ("A defamatory communication . . . in the form of an opinion . . . is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."). Nonetheless, defamation cannot arise where the speaker communicates the non-defamatory facts that undergird his opinion. Yohe, 321 F.3d at 41–42. Thus, the speaker can immunize his statement from defamation liability by fully disclosing the non-defamatory facts on which his opinion is based. Howell v. Enter. Publ'g Co., 455 Mass. 641, 671–72 (2010).

Put together, "the relevant question is not whether challenged language may be described as an opinion, but whether it reasonably would be understood to declare or imply provable assertions of fact." Phantom Touring, 953 F.2d at 727 (discussing Milkovich, 497 U.S. at 21). Whether a statement is a verifiable fact or an opinion can be decided by the court as a matter of law. Gray, 221 F.3d at 248; Lyons v. Globe Newspaper Co., 415 Mass. 258,

-11-

263 (1993). This task requires an examination of the totality of the circumstances in which the specific challenged statements were made, including the general tenor and context of the conversation and any cautionary terms used by the person publishing the statement. Yohe, 321 F.3d at 41; Riley v. Harr, 292 F.3d 282, 290 (1st Cir. 2002); Howell, 455 Mass. at 671.

With this framework in mind, we conclude that the statements concerning Plaintiffs' conduct during the encounter and their potential knowledge of the missing family's whereabouts constitute non-actionable opinions where Defendant fully disclosed the non-defamatory facts undergirding his opinion.

## A. Unprofessional Conduct

At multiple points during their conversation, Bartels told Carbone that he found Plaintiffs' behavior unprofessional. The term 'professional' typically does not lend itself to any "single, readily ascertainable meaning," see Levinsky's v. Wal-Mart Stores, Inc., 127 F.3d 122, 129 (1st Cir. 1997). For example, the Oxford English Dictionary defines 'professional' as "[r]eaching a standard or having the quality expected of a professional person or his work; competent in the manner of a professional." 12 The Oxford English Dictionary 573 (2d ed. 1989). Merriam-Webster's Collegiate Dictionary adds the following aspect: "exhibiting a courteous, conscientious, and generally businesslike manner in the workplace." Merriam-Webster's Collegiate Dictionary 991 (11th ed.

2003).  Taken in the context of the full conversation, Defendant's statements touch on these imprecise and subjective connotations of the term 'professional.'  Where an expressive phrase, though pejorative and unflattering, cannot be "objectively verified," it "belongs squarely in the category of protected opinion." Levinsky's, 127 F.3d at 130 (rejecting defamation claim based on description of clothing store as "trashy"); Phantom Touring, 953 F.2d at 728 (holding that newspaper's critique of a theater production as "fake" and "phony" could not be proven true or false, "since those adjectives admit of numerous interpretations"); McCabe v. Rattiner, 814 F.2d 839, 842-43 (1st Cir. 1987) (concluding that characterization of condominium sales pitch as a "scam" was not actionable because the term lacks a precise "core meaning"). Whether or not a particular person's behavior may be characterized as 'professional' or exhibiting 'professional courtesy' will often be a quintessential "expression[] of personal judgment" which is "subjective in character," Gray, 221 F.3d at 248.

The term 'professional' can also be used in a more objective sense, as "characterized by or conforming to the technical or ethical standards of a profession or occupation." Webster's Third New International Dictionary 1811 (1961).  Thus, in some contexts, a statement that a person has acted unprofessionally, without explanation, might imply the existence of undisclosed defamatory facts concerning a sufficiently objective

-13-

standard of conduct.  Here, however, Plaintiffs do not allege that Defendant accused them of violating any technical, ethical, or commonly-understood standard.  Even if some type of shared standard of professionalism for police and federal agency conduct could be identified that would have been readily understood by both Defendant and Carbone, Defendant explained the circumstances of the encounter, thus providing Carbone with the factual basis underlying his opinion of Plaintiffs' conduct.  See Restatement (Second) of Torts § 566 cmt. b (1977) (a comment on "the plaintiff's conduct, qualifications or character" coupled with a statement of the facts on which the speaker bases that opinion constitutes one type of "pure" opinion).  For example, Bartels told Carbone that Quaglia apologized following the initial encounter and conceded that "all in all [Plaintiffs] left in an amicable fashion."  Likewise, Bartels affirmed Carbone's statement that "[Plaintiffs'] story did pan out. . . . they just weren't too social about it."  Thus, the full context of the conversation makes clear that Defendant fully disclosed the non-defamatory facts about the confrontation in a way that allowed Carbone to form his own impression.  Accordingly, the district court correctly concluded that Defendant's statements regarding his impression of Plaintiffs' professionalism were not actionable under defamation law.  Cf. Wait v. Beck's N. Am., Inc., 241 F. Supp. 2d 172, 183 (N.D.N.Y. 2003) (observing that "[s]tatements that someone has acted unprofessionally or

-14-

unethically generally are constitutionally protected statements of opinion" and citing cases); Naeemullah v. Citicorp Servs., Inc., 78 F. Supp. 2d 783, 793 (N.D. Ill. 1999) (classifying statements that plaintiff "has poor interpersonal skills and run-of-the-mill professional abilities" as "nonactionable statements of subjective opinion"); Froess v. Bulman, 610 F. Supp. 332, 342 (D.R.I. 1984) ("[I]t is not for the Court to assess the wisdom of the defendant's opinion [that, inter alia, plaintiff was 'downright professionally rude' and did not 'show enough professional courtesy'], or to punish him for expressing it."); Pritsker v. Brudnoy, 389 Mass. 776, 781-82 (1983) (concluding that statements critical of restaurant, including that owners were "unconscionably rude and vulgar people," were non-actionable opinions); see also Catalfo v. Jensen, 657 F. Supp. 463, 468 (D.N.H. 1987) ("Ethical standards are inherently subjective, and what is sleazy to one person will not necessarily be so to another.").

## B. Possible Knowledge of Family's Whereabouts

Defendant's statements regarding Plaintiffs' possible knowledge of the family's whereabouts are on a somewhat different footing. On its face, the proposition that Plaintiffs may have known the location of the family "seems sufficiently factual to be proved true or false," Levinsky's, 127 F.3d at 131, and thus could, under certain circumstances, give rise to defamation liability. For example, we said in Gray that a statement concerning whether

the plaintiff was personally acquainted with someone could, if false, support a defamation claim because whether the plaintiff had met a certain person "is an objective fact." 221 F.3d at 249. Similarly, in Milkovich, the Supreme Court instructed that the statement "[i]n my opinion John Jones is a liar" could be actionable because it implies the speaker knows at least one undisclosed objective fact -- that Jones told a lie. 497 U.S. at 18-19.

However, Defendant's "full disclosure of the facts underlying his judgment -- none of which have been challenged as false -- makes this case fundamentally different from Milkovich." Phantom Touring, 953 F.2d at 730. The transcript of Defendant's conversation with Carbone shows that Defendant disclosed several non-defamatory facts underlying his "assum[ption] that [Plaintiffs] know where they are." Defendant conveyed his "belie[f]" that Piccone's house had been searched in the past month, reasoning that she probably knew about the outstanding arrest warrants for the missing parents. Defendant speculated that Plaintiffs possessed a motive to "get the kids situated" so that the parents could "deal with their criminal charges." Defendant also pointed out that Plaintiffs attended the February 1 custody hearing, telling Carbone, "I'm assuming that they know where they are, only because they're here trying to get . . . custody." Based on these facts, Defendant answered in the affirmative when Carbone questioned

-16-

whether it was "fair to presume" that Piccone "probably kn[ew]" the family's location.

Defendant's full disclosure of the non-defamatory facts in his possession invited Carbone to extrapolate his own independent impressions from the information provided. Id. at 731. Ultimately, Defendant only assented to Carbone's own characterization of Plaintiffs' probable knowledge. This is a "crucial distinction" from Milkovich where the context of the communication implied that "only one conclusion was possible." Id. At the most, Defendant's statements amount to his "personal conclusion[s] about the information presented." Id. at 730. The First Amendment generally protects statements of opinion where the speaker "'outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the [listener] free to draw his own conclusions.'" Riley, 292 F.3d at 289 (quoting Partington v. Bugliosi, 56 F.3d 1147, 1156–57 (9th Cir. 1995)).

Viewed in the context of the full conversation, Defendant's statements possess a definitively speculative nature. Defendant made clear to Carbone that he lacked concrete facts to confirm his suspicion that Plaintiffs may have known the family's whereabouts. For example, when Carbone inquired whether the officers had asked Plaintiffs if they knew where the parents were, Defendant told Carbone "[w]e didn't ask them specifically." He

also clarified that he did not "know" whether Plaintiffs were aware of the arrest warrants. Moreover, when Carbone invited Defendant to allege wrongdoing (asking whether Plaintiffs tried to "thwart" law enforcement), Defendant refused to do so (replying, "No that -- that didn't happen"). Thus, in combination with the disclosure of underlying facts, "it becomes even more clear that the [speaker] is merely speculating . . . about [an] inference." Gray, 221 F.3d at 250-51. Because Defendant's statements are "properly understood as purely speculation," they are "protected as opinion." Id. at 250.

Admittedly, the version of events Defendant relayed to Carbone do present a somewhat skewed view of his interaction with Piccone and Quaglia. Other parts of the record, most notably Defendant's conversation with the state trooper, indicate that Defendant may well have been acting with a vindictive motive when he made the call to DHS. But "[a]n 'expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified or unreasonable the opinion may be or how derogatory it is.'" Yohe, 321 F.3d at 42 (quoting Dulgarian v. Stone, 420 Mass. 843, 850 (1995)).

Because all of the allegedly defamatory statements amount to non-actionable opinions, we affirm the district court's grant of summary judgment to Defendant. As for the IABR claim, Plaintiffs do not challenge the district court's conclusion that this claim

-18-

cannot proceed in the absence of a viable defamation claim.  Since the IABR claim is "premised on precisely the same facts as [the] defamation claim," Yohe, 321 F.3d at 44, we affirm  the district court's summary judgment decision as to this claim as well.[3]

### III. Conclusion

For the foregoing reasons, we affirm the district court's grant of summary judgment to Defendant.  Each party shall bear its own costs.

---

[3] The district court assumed for the purpose of its analysis that Massachusetts's Actual Malice Statute could be applicable to otherwise non-actionable expressions of opinion.  Piccone v. Bartels, 40 F. Supp. 3d 198, 214 (D. Mass. 2014).  That statute provides that a defendant "in an action for writing or for publishing a libel may introduce in evidence the truth of the matter contained in the publication charged as libellous; and the truth shall be a justification unless actual malice is proved." Mass. Gen. Laws ch. 231, § 92.  The district court concluded that although there were genuine issues of material fact concerning whether Defendant made his statements with actual malice, the Actual Malice Statute did not provide an alternate avenue for recovery because it applies only to libel actions.  Piccone, 40 F. Supp. 3d at 214 (quoting Bander v. Metro Life Ins. Co., 313 Mass. 337, 342 (1943) (stating that the Actual Malice Statute "does not apply to an action for slander")).  The district court also held that even if the statute did apply to allegations of slander, Plaintiffs could not recover under the statute because they are both public officials.  Piccone, 40 F. Supp. 3d at 214–15 (quoting Materia v. Huff, 394 Mass. 328, 333 n.6 (1985) (holding that "a judge cannot constitutionally apply [the Actual Malice Statute] to a public figure or public official")); see also Piccone, 40 F. Supp. 3d at 218–20 (holding that Plaintiffs are public officials under applicable case law).  Plaintiffs' brief on appeal concedes that the Actual Malice Statute is inapplicable to this case because it reaches only libel and not slander.  Thus, we need not discuss the district court's determination that the statute might apply to expressions of opinion, or the court's conclusion that Plaintiffs are public officials under the First Amendment.

-19-