**Gina Marie CATALFO; Alfred T. Catalfo; Carole Joanne Catalfo; Alfred Catalfo, Jr.**

v.

**Jack JENSEN; Brad Edmondson; Ithaca Times.**

**Civ. No. 85–588–D.**

United States District Court, D. New Hampshire.

April 8, 1987.

Thomas E. Flynn, Jr., Gerald Taube, Portsmouth, N.H., for plaintiffs.

Dirk Galbraith, Ithaca, N.Y., for Jensen.

William L. Chapman, Concord, N.H., for all defendants.

Steven Eric Feld, Portsmouth, N.H., for Jensen and Edmondson.

Peter J. Walsh, Richard B. Thaler, Ithaca, N.Y., for Ithaca Times.

## ORDER

DEVINE, Chief Judge.

In these consolidated actions, plaintiffs Alfred Catalfo, Jr. ("Attorney Catalfo"), and his three children, Gina Marie Catalfo, Alfred T. Catalfo, and Carole Joanne Catalfo, bring suit against defendants Jack Jensen, Brad Edmondson, and Ithaca Times[1] seeking damages for an allegedly defamatory article that appeared in Ithaca Times and Portsmouth Magazine in March 1984. These actions were originally brought in Strafford County Superior Court and were properly removed to this court pursuant to 28 U.S.C. § 1441.[2] This matter is presently before the Court on defendants' motions for summary judgment and plaintiffs' objection thereto.[3]

Under Rule 56(c), Fed.R.Civ.P., summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party must affirmatively demonstrate that there is no genuine, material factual issue, and the Court is required to view the record in the light most favorable to the party opposing the motion and indulge all inferences favorable to that opposing par-

1. An additional defendant, Jon Crispin, moved for and was granted summary judgment by previous Order of this Court. *See Catalfo v. Jensen,* 628 F.Supp. 1453 (D.N.H.1986).

2. Jurisdiction is based upon 28 U.S.C. § 1332, the parties being diverse and the amount in controversy exceeding $10,000 exclusive of interest and costs.

3. Defendant Ithaca Times filed its motion for summary judgment with supporting memoran-

dum on January 8, 1987, plaintiffs' objection thereto was filed on January 28, 1987, and Ithaca Times filed a supplemental memorandum of law on February 23, 1987. On February 23, 1987, defendants Jensen and Edmondson also moved for summary judgment, relying on Ithaca Times' motion and supporting memoranda as the grounds therefor. Accordingly, the Court views plaintiffs' objection as applying to the motion of defendants Jensen and Edmondson as well as to that of Ithaca Times.

ty. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *General Office Products Corp. v. M.R. Berlin Co., Inc.*, 750 F.2d 1, 2 (1st Cir.1984). The record before the Court reveals the following undisputed facts.

An article was published in both Ithaca Times and Portsmouth Magazine at about the time of New Hampshire's 1984 first-in-the-nation presidential primary. The article, entitled "Cookies and Candipods" and subtitled "3 brash young journalists cover the press covering the candidates covering New Hampshire", is written in the first person and presents a satirical and often cynical view of the entire campaign process in the Granite State at that time. The article, which took up four pages in Portsmouth Magazine, details a full day of campaigning seventy-two hours before the primary. It is comprised of vignettes from the press bus and various campaign stops of several different candidates. Midway through the article, a visit by the Mondale entourage to the home of plaintiffs herein is described. Plaintiffs allege that three statements about them contained in this portion of the article are defamatory.[4] The first is a reference to Attorney Catalfo: "Mondale introduces Catalfo (a fat version of Dustin Hoffman's 'Ratso' in Midnight Cowboy) ..." (" 'Ratso' statement"). The second is the author's comment that "maybe there is a mickie[5] in the Canadian Club ..." (" 'mickie' statement"). Finally, plaintiffs allege that the phrase "Mondale had his arm around the sleazy little Catalfos ..." (" 'sleazy' statement") is defamatory.[6]

Defendants have moved for summary judgment in this matter, asserting several grounds therefor. Defendants argue that none of the statements about which plaintiffs complain are reasonably capable of being understood in a defamatory sense. Furthermore, they contend that even if one or more of these statements could be construed as defamatory, they are not actionable, as they are protected expressions of opinion. Finally, defendants assert that plaintiffs Carole Joanne Catalfo and Gina Marie Catalfo, who are nowhere mentioned or referred to in the article, cannot maintain this action as the statement about which they complain is not "of and concerning" them. For the following reasons, the Court agrees with defendants that they are entitled to judgment as a matter of law. Only those arguments necessary to the resolution of the motions will be addressed.

The relevant aspects of the law of defamation in New Hampshire[7] and the standards by which the Court must judge the issues raised are well established. Language is defamatory when it tends "to lower the plaintiff 'in the esteem of any substantial and respectable group, even though it may be quite a small minority.' " *Morrissette v. Cowette*, 122 N.H. 731, 733, 449 A.2d 1221 (1982) (quoting *Thomson v. Cash*, 119 N.H. 371, 373, 402 A.2d 651 (1979)). Moreover, "[i]t is axiomatic that '[w]ords alleged to be defamatory must be read in the context of the publication taken as a whole.' " *Duchesnaye v. Munro Enterprises, Inc.*, 125 N.H. 244, 249, 480 A.2d 123 (1984) (quoting *Morrissette v. Cowette*, *supra*, 122 N.H. at 733, 449 A.2d 1221). The Court must consider "all the circumstances under which [the] words were written, their context, [and] the meaning which

---

**4.** The entire recounting of the Mondale visit to the Catalfo home as it appeared in the article is reprinted in an Appendix to this Order.

**5.** "Mickie" is short for "Mickey Finn", a "drink of liquor doctored with a purgative or a drug." *Webster's New Collegiate Dictionary* 726 (5th ed. 1977).

**6.** This matter was initially brought as four separate actions, with Alfred Catalfo, Jr., complaining only of the first two statements and each of his three children complaining only of the third. However, in their objection to defendants' mo-

tions in this now-consolidated action, plaintiffs assert that the "sleazy little Catalfos" statement is defamatory as to all four plaintiffs. As it is irrelevant to the Court's disposition of the pending motions, the Court will not trouble itself with Attorney Catalfo's failure to amend his complaint and will simply assume that all four plaintiffs have challenged the "sleazy" statement.

**7.** The Court assumes, and no party suggests otherwise, that New Hampshire law applies to those aspects of this diversity action which are governed by state law.

could reasonably be given to them by the readers." *Chagnon v. Union Leader Co.,* 103 N.H. 426, 435, 174 A.2d 825 (1961), *cert. denied,* 369 U.S. 830, 82 S.Ct. 846, 7 L.Ed.2d 795 (1962). As the New Hampshire Supreme Court has expounded,

[t]he defamatory meaning must be one that could be ascribed to the words by 'hearers of common and reasonable understanding.' *Jones v. Walsh,* 107 N.H. 379, 381, 222 A.2d 830, 832 (1966). An action in libel cannot be maintained on an artificial, unreasonable, or tortured construction imposed upon innocent words, nor when only 'supersensitive persons, with morbid imaginations' would consider the words defamatory. *Lambert v. Providence Journal Co.,* 508 F.2d 656, 659 [1st Cir.1975], *cert. denied,* 423 U.S. 828 [96 S.Ct. 45, 46 L.Ed.2d 45] (1975) (citations omitted). 'No mere claim of the plaintiff can add a defamatory meaning where none is apparent from the publication itself.' W. Prosser, [Law of Torts § 111] at 749 [(4th ed. 1971)]. *See also* 53 C.J.S. *Libel and Slander* § 162(b), at 250–51 (1948).

*Thomson v. Cash, supra,* 119 N.H. at 373, 402 A.2d 651.

Whether a communication is capable of bearing a defamatory meaning is an issue of law to be determined by the Court. *Blanchard v. Claremont Eagle, Inc.,* 95 N.H. 375, 378, 63 A.2d 791 (1949); Restatement (Second) of Torts § 614 (1977). Only if the Court determines that language is defamatory is there then the question for the jury whether the communication was in fact understood by its recipient in the defamatory sense. Restatement (Second) of Torts § 614 comment b.

Plaintiffs ascribe the following defamatory meanings to the three challenged statements. The "Ratso" statement suggests that Attorney Catalfo, like the Ratso character, "lies, cheats and steals as a way of life." The "mickie" statement suggests that he was "serving illegal drugs to unwary guests". And the "sleazy" statement, which refers to all of the Catalfos, "suggests the worst qualities of character, bereft of trustworthiness and a disgrave

[sic] in the community". Plaintiffs' Objection to Defendant Ithaca Times' Motion for Summary Judgment at 2.

■ The Court finds that the "mickie" statement is not capable of bearing the defamatory meaning plaintiffs ascribe to it. When viewed in the context of the entire article and the paragraph in which it appears, no reasonable reader could infer that it suggests that Attorney Catalfo was serving illegal drugs to his guests. The paragraph in question reads as follows.

We pencils get to listen to the introduction and speeches in the other room through a pair of speakers set on the piano. Maybe it is the bizarre acoustics of the setup, or maybe there was a mickie in the Canadian Club. I don't know. But sometime during the weird Catalfo debacle I snap my binder, blow my bung, lose my handle.

The format itself precludes the factual interpretation plaintiffs assert. The mickie statement is presented as an alternative, followed by "I don't know". Furthermore, given the tongue-in-cheek style of the entire article, only "supersensitive persons, with morbid imaginations", *Thomson v. Cash, supra,* 119 N.H. at 373, 402 A.2d 651, could understand the mickie statement to suggest that Attorney Catalfo was illegally drugging his guests' drinks. It is unreasonable to view the "mickie" statement as anything more than rhetorical hyperbole. *See Greenbelt Coop. Publishing Ass'n v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 1541, 26 L.Ed.2d 6 (1970) (description of plaintiff's negotiating position as blackmail cannot be reasonably viewed as charging commission of crime). Accordingly, the Court finds that defendants are entitled to summary judgment as to the "mickie" statement.

The "Ratso" and "sleazy" statements present closer questions as to whether they are capable of the defamatory meanings alleged by plaintiffs. While the Court doubts that a reasonable reader would understand these statements to have the extremely offensive meanings plaintiffs ascribe to them, the Court is satisfied that they could be viewed as defamatory. With-

out the necessity of an in-depth analysis of "Midnight Cowboy", the Court finds that likening Attorney Catalfo to Ratso Rizzo could reasonably lower him in the esteem of a substantial number of people who had seen the film. Furthermore, while the term "sleazy" is primarily used as an adjective to describe flimsy or shoddy material,[8] a subsidiary definition of "marked by low ethical standards" does appear in an unabridged dictionary, *see Webster's Third New International Dictionary* 2140 (1969). Thus, the Court finds that it must address defendants' next argument: defendants contend that even if these two statements are capable of defamatory meaning, they are protected expressions of opinion.

The New Hampshire Supreme Court recently summarized the analysis that must be conducted to determine whether defamatory material alleges actionable fact or expresses protected opinion.

> [T]he basic rule [is] that for actionable libel, there must be publication of a false statement of fact, Restatement (Second) of Torts § 581A (1977), that tends to lower the plaintiff in the esteem of any substantial and respectable group of people. *Duchesnaye v. Munro Enterprises, Inc.,* 125 N.H. 244, 252, 480 A.2d 123, 127 (1984). Conversely, a statement of opinion is not actionable, *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40 [94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789] (1974); *Pease v. Telegraph Pub. Co., Inc.,* 121 N.H. 62, 65, 426 A.2d 463, 465 (1981), unless it may reasonably be understood to imply the existence of defamatory fact as the basis for the opinion. *Duchesnaye v. Munro Enterprises, Inc., supra* [125 N.H.] at 249, 480 A.2d at 125; Restatement (Second) of Torts § 566 (1977). Whether a given statement can be read as being or implying an actionable statement of fact is itself a question of law to be determined by the trial court in the first instance, *Pease v. Telegraph Pub. Co., Inc., supra* [121 N.H.] at 65, 426 A.2d at 465, considering the context of the publication as a whole. *See Mor-*

*rissette v. Cowette,* 122 N.H. 731, 733, 449 A.2d 1221, 1222 (1982). If an average reader could reasonably understand a statement as actionably factual, then there is an issue for a jury's determination, and summary judgment must be denied. *See Pease v. Telegraph Pub. Co., Inc., supra.*

*Nash v. Keene Publishing Corp.,* 127 N.H. 214, 219, 498 A.2d 348 (1985). As the above citation to *Gertz v. Robert Welch, Inc.,* indicates, it is in the fact versus opinion realm of defamation law that constitutional concerns intrude into what is otherwise a cause of action governed by state law. As the Supreme Court stated in *Gertz:*

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

*Id.* at 339–40, 94 S.Ct. at 3007 (footnote omitted).

Since *Gertz,* courts have grappled with fashioning a test to differentiate between fact and opinion, a task which is not as easy as it might seem. A consensus seems to be developing that a "totality of the circumstances" surrounding the alleged defamation must be considered and that certain factors should be applied in this evaluation. *See, e.g., Janklow v. Newsweek, Inc.,* 788 F.2d 1300 (8th Cir.) (en banc), *cert. denied,* ——— U.S. ———, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986); *Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984) (en banc), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). Fortunately, this Court is guided in its excursion into this still-developing area of law by the First Circuit's very recent opinion in *McCabe v. Rattiner,* 814 F.2d 839 (1987). In this opinion, the First Circuit adopted the approach wherein an alleged defamation must be analyzed in the context of the article in which it appears, along with the larger social context to which it relates. *Id.,* at 842.

---

**8.** *See Webster's New Collegiate Dictionary* 1091    (5th ed. 1977).

Specifically, the court stated that in considering whether the contested language was protected speech, "we will examine the statement itself, the article as a whole, and its social context...." *Id.* Application of these principles to the two remaining statements at issue leads this Court to conclude that they are constitutionally protected expressions of opinion.

■ Beginning with the statements themselves, the Court notes that the "Ratso" statement cannot be plausibly read as anything more than a comment upon physical appearance. Plaintiffs' contention that the statement "Mondale introduces Catalfo (a fat version of Dustin Hoffman's 'Ratso' in Midnight Cowboy)" implies that Attorney Catalfo bears the *personality* traits of the fictional character is unreasonable. The context of the statement in the article supports this finding. The section that discusses the Mondale visit to the Catalfo home (*see* Appendix) begins with a veteran photographer explaining to the author who Catalfo is. Very shortly thereafter, the "Ratso" statement is made, with no other information about Catalfo given or inferred. It is clear that the statement simply gives an opinion as to Attorney Catalfo's physical appearance. As such, it is the classic expression of pure opinion, as the facts on which the author bases his opinion—seeing Attorney Catalfo and presumably having seen "Midnight Cowboy"—are stated. *See* Restatement (Second) of Torts § 566 comment b (1977). While this might be a harsh, unflattering judgment, it is nonetheless protected opinion. *Id.* at comment d. Furthermore, it is important to note that this is a statement which is incapable of being proven true or false. *McCabe v. Rattiner, supra,* at 842. Reasonable people could obviously disagree as to whether one person physically resembles another.

■ The Court similarly concludes that the "sleazy" statement is a protected expression of opinion. The word "sleazy" itself—even accepting the subsidiary meaning of "marked by low ethical standards"—like the word "scam", which was at issue in *McCabe*, does not have a precise meaning

such that it is capable of verification. Ethical standards are inherently subjective, and what is sleazy to one person will not necessarily be so to another. Moreover, given the context of the entire article, with its biting satirical flavor and the indication that the author knew nothing of the Catalfos other than what he saw and described of that evening, there is no reasonable inference to be drawn of undisclosed defamatory facts.

Finally, while the social context of the article is not necessary to the Court's determination that the two statements in issue are protected opinion, the Court notes that it provides support therefor. It is undisputed that Attorney Catalfo is a former Democratic state chairman and a former candidate for the United States Senate from New Hampshire. While he is no longer active in party politics, for many years he has hosted a private reception shortly before the presidential primary for one of the candidates. In the case of the reception for Mondale described in the article, some fifty to sixty newspaper and television reporters and cameramen were invited to the Catalfo home to cover the event, and during the reception Attorney Catalfo and his son appeared with Mondale before them. While it is true that Catalfo himself has not run for office or been active in the state Democratic party for some time, he nevertheless willingly thrust himself into the political limelight by hosting this event. As Judge Bork explained in his concurrence in *Ollman v. Evans, supra,* 750 F.2d at 1002:

> [O]ne of the most important considerations is whether the person alleging defamation has in some real sense placed himself in an arena where he should expect to be jostled and bumped in a way that a private person need not expect. Where politics and ideas about politics contend, there is a first amendment arena. The individual who deliberately enters that arena must expect that the debate will sometimes be rough and personal.

The Catalfos hosted a media event at their home, and they cannot now recover

for the unflattering remarks made about them by the very press they invited. Thus, in conclusion, the Court finds that defendants' motions for summary judgment must be granted.

SO ORDERED.

### APPENDIX

**7 p.m. Bedford. The Catalfo home.** "Catalfo's a big party wheel," says one of the veteran newsmagazine photographers. "Every four years he annoints his choice with this dinner. Standard drill."

So we are bused and ushered and boozed and fed. The house, a New Hampshire version of a surburban mansion, is so packed with balding old men and their gussied-up wives and bored children that there is barely room for the 50 or 60 media types. Appalling. The pencil press is ushered into another room so the cameras can get good shots of the candidate and the chosen party hacks as they come down the winding staircase like good little boys on Christmas morning.

Mondale introduces Catalfo (a fat version of Dustin Hoffman's "Ratso" in Midnight Cowboy) as the next vice-president of the United States. He introduces Catalfo's eldest son as the next attorney general. "Har-har-har." He goes into his handy little speech about Reagan's leadership, and his standard spiel on his own readiness to run the country.

We pencils get to listen to the introduction and speeches in the other room through a pair of speakers set on the piano. Maybe it is the bizarre acoustics of the setup, or maybe there was a mickie in the Canadian Club. I don't know. But sometime during the weird Catalfo debacle I snap my binder, blow my bung, lose my handle.

Mondale's voice through the speakers sounds more like Hubert Humphrey than Humphrey ever did; a total hopelessness comes over me that sends me scrambling back to the bar. We had spent the whole day with Mondale and hadn't gotten to ask him a question. We had not even *heard* a question, except "How much will you win by?" Everybody in the room now was saying "Har-har-har." Mondale had his arm around the sleazy little Catalfos, and his aides were grinning like alligators who had just chewed their way through a litter of kittens: har-har-har. I just couldn't take it any more.

Somewhere in New Hampshire John Glenn was dishing up beans and franks from a big pot for his supporters.

Somewhere in New Hampshire Gary Hart was hosting a sock-hop at the Elks Club.

Somewhere in New Hampshire George McGovern was addressing a PTA meeting.

And somewhere in New Hampshire, a voter was sitting down with a stack of candidate position papers, analyzing the various programs and voting records, examining his own beliefs and ideologies and comparing them with those of the contenders, trying to make an intelligent choice on a vital issue. There just had to be one, and I was going to find him.