NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Sullivan
No. 2018-0198

AUTOMATED TRANSACTIONS, LLC & a.

v.

AMERICAN BANKERS ASSOCIATION & a.

Argued: February 14, 2019
Opinion Issued: August 16, 2019

Shaheen & Gordon, P.A., of Concord (Steven M. Gordon, Timothy J. McLaughlin, and Stephanie K. Annunziata on the brief, and Mr. Gordon orally), for the plaintiffs.

Devine, Millimet & Branch, P.A., of Manchester (Jonathan Shirley and Joshua M. Wyatt on the brief, and Mr. Wyatt orally), for defendant American Bankers Association.

Litchfield Cavo, LLP, of Lynnfield, Massachusetts (Mark A. Darling and Bethany P. Minich on the brief, and Mr. Darling orally), for defendant Credit Union National Association.

Desmarais Law Group, PLLC, of Manchester (Debra L. Mayotte on the brief and orally), for defendants Robert H. Stier and Pierce Atwood, LLP.

Gilles R. Bissonnette, of Concord, on the brief, for American Civil Liberties Union of New Hampshire and Electronic Frontier Foundation, as amici curiae.

HANTZ MARCONI, J.  The plaintiffs, Automated Transactions, LLC (ATL) and David Barcelou, appeal an order of the Superior Court (Tucker, J.) dismissing their defamation and New Hampshire Consumer Protection Act (CPA) claims against the defendants, American Bankers Association (ABA), Credit Union National Association (CUNA), Robert H. Stier, and Pierce Atwood, LLP.  The plaintiffs argue that the trial court erred because it could not determine, at the motion to dismiss stage, that the statements upon which the plaintiffs premised the defendants' liability were nonactionable.  We affirm.

I

The plaintiffs' amended complaint alleges the following facts.  Barcelou is an inventor who, after achieving success with various inventions in the 1970s and 80s, began working in 1993 toward "automating tournaments."  He hoped to develop a system where any "game of skill" could automatically accept an entry fee, administrate a winner, and award the winner an immediate cash prize.  Barcelou, who created a prototype of this "Automated Tournament Machine" in 1994, sought to include "automated teller machine" (ATM) functionality in his invention, i.e., the ability to dispense cash.

Once his prototype was complete, Barcelou hired a computer scientist to document his invention, as well as an industrial design firm to help refine it.  After creating additional prototypes, he filed patent applications, sought capital investments, and assembled a management team.  Although his efforts to commercialize his invention were ultimately unsuccessful, he was granted an ATM-related patent by the United States Patent and Trademark Office in 2005.  A short time thereafter, Barcelou sued the convenience store chain "7-Eleven," alleging that the store's "VCOM" machines infringed his newly-granted patent.

In or around 2008, Barcelou formed ATL and made the company the exclusive licensor of his patent.  ATL began offering patent licenses and bringing infringement litigation, and pursued additional patents on Barcelou's ATM-related innovations.  The company's efforts were largely fruitful: from 2011 to 2012, ATL generated over $3 million in licensing revenues.  In addition, the United States Patent and Trademark Office granted the plaintiffs additional ATM-related patents.  It is in the wake of this success that the

2

plaintiffs argue, in their amended complaint, that the defendants engaged in a "defamatory smear campaign . . . in a malicious effort to destroy" their legitimate licensing efforts. For example, the defendants made statements referring to ATL as a "patent troll," as well as statements characterizing ATL's licensing efforts as extortive. The plaintiffs contend that ATL's revenues have declined due to the defendants' statements, and that their statements permanently damaged Barcelou's reputation and caused him emotional distress.

The plaintiffs sued the defendants, among others,[1] for defamation and for violation of the CPA. The defendants moved to dismiss the plaintiffs' claims, arguing, inter alia, that their statements could not give rise to defamation liability because they were only expressions of opinion. The trial court granted the defendants' motions. The court found that the references to the plaintiffs as patent trolls were no more than the opinions of the defendants, the facts upon which those opinions were based were evident from context, and the statements did not imply the existence of other facts. Regarding the statements referring to the plaintiffs' activity as extortive, the court dismissed the plaintiffs' defamation claims as to these statements because it found them to be rhetorical hyperbole, not assertions of fact. The court also dismissed the plaintiffs' CPA claims.

II

On appeal, the plaintiffs argue that the court erred in dismissing their claims. In reviewing a motion to dismiss, our standard of review is whether the allegations in the plaintiffs' pleadings are reasonably susceptible of a construction that would permit recovery. Sanguedolce v. Wolfe, 164 N.H. 644, 645 (2013). We assume the plaintiffs' pleadings to be true and construe all reasonable inferences in the light most favorable to the plaintiffs. Id. We need not assume the truth of statements that are merely conclusions of law, however. Id. We then engage in a threshold inquiry that tests the facts in the complaint against the applicable law, and if the allegations constitute a basis for legal relief, we must hold that it was improper to grant the motion to

---

[1] In addition to defendants ABA, CUNA, Pierce Atwood, and Stier, the plaintiffs named the following entities as defendants in their amended complaint: Crain Communications, Inc. d/b/a Crain's New York Business; Charles von Simson; W. John Funk; Gallagher, Callahan & Gartrell, P.C.; Networld Alliance, LLC; Ralph E. Jocke; Walter & Jocke Co., LPA; Mascoma Savings Bank; and Stephen F. Christy. Defendants Charles von Simson, Ralph E. Jocke, and Walker & Jocke Co., LPA filed motions to dismiss on personal jurisdiction grounds, which the trial court granted, and which the plaintiffs have not appealed. Defendants Mascoma Savings Bank and Stephen F. Christy filed a motion for summary judgment, which the trial court granted, and which the plaintiffs have not appealed. The plaintiffs filed motions for voluntary nonsuit as to defendants Crain Communications, Inc. d/b/a Crain's New York Business and Networld Alliance, LLC, which the trial court granted. Finally, although the trial court dismissed the plaintiffs' claims against defendants W. John Funk and Gallagher, Callahan & Gartrell, P.C., the plaintiffs have not appealed the dismissal of their claims against those two defendants.

3

dismiss.  Id.  In conducting this inquiry, we may also consider documents attached to the plaintiffs' pleadings, documents the authenticity of which are not disputed by the parties, official public records, or documents sufficiently referred to in the complaint.  Ojo v. Lorenzo, 164 N.H. 717, 721 (2013).

"To survive the motion to dismiss, the plaintiff[s] must have alleged facts that would show that the defendant[s] failed to exercise reasonable care in publishing a false and defamatory statement of fact about [the plaintiffs] to a third party."  Cluff-Landry v. Roman Catholic Bishop of Manchester, 169 N.H. 670, 678 (2017) (quotation omitted); see Pierson v. Hubbard, 147 N.H. 760, 763 (2002); Indep. Mechanical Contractors v. Gordon T. Burke & Sons, 138 N.H. 110, 118 (1993).  Embedded in this recitation is the requirement that the challenged statement be one "of fact."  Pierson, 147 N.H. at 763.  Conversely, "[a] statement of opinion is not actionable unless it may reasonably be understood to imply the existence of defamatory fact as the basis for the opinion."  Thomas v. Telegraph Publ'g Co., 155 N.H. 314, 338 (2007) (citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-19 (1990));[2] accord Nash v. Keene Publishing Corp., 127 N.H. 214, 219 (1985); see also Restatement (Second) of Torts § 566, at 170 (1977) ("A defamatory communication may consist of . . . an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.").  A further corollary of defamation law's factual requirement is that statements of "rhetorical hyperbole" are not actionable because they cannot reasonably be interpreted as factual assertions.  Milkovich, 497 U.S. at 20 (quotation omitted); see Pease, 121 N.H. at 65.  Whether a given statement can be read as being or implying an actionable statement of fact is a question of law to be determined by the trial court in the first instance.  Thomas, 155 N.H. at 338-39; accord Piccone v. Bartels, 785 F.3d 766, 772 (1st Cir. 2015); see also Riley v. Harr, 292 F.3d 282, 291 (1st Cir. 2002) ("[T]he courts treat the issue of labeling a statement as . . . protected opinion as one ordinarily decided by judges as a matter of law." (quotation and brackets omitted)).  Words alleged to be defamatory must be read in the context of the publication taken as a whole.  Morrissette v. Cowette, 122 N.H. 731, 733 (1982); accord Duchesnaye v. Munro Enterprises, Inc., 125 N.H. 244, 249 (1984).

---

[2] Although defamation is a state law cause of action, the requirement that the challenged statement be one of fact is an aspect of defamation law in which "constitutional concerns intrude into what is otherwise a cause of action governed by state law."  Catalfo v. Jensen, 657 F. Supp. 463, 467 (D.N.H. 1987); see Pease v. Telegraph Pub. Co., Inc., 121 N.H. 62, 63 (1981) (explaining that allegedly defamatory statements "were opinions and therefore within the [F]irst [A]mendment protection").  The United States Supreme Court "has read the First Amendment . . . to impose additional limitations in defamation cases, whether or not they are also part of state law."  Gray v. St. Martin's Press, Inc., 221 F.3d 243, 248 (1st Cir. 2000).  Milkovich held "that only statements that present or imply the existence of facts that can be proven true or false are actionable under state defamation law."  Id.; see Milkovich, 497 U.S. at 18-20.  Thus, New Hampshire's requirement that the challenged statement must assert or imply the existence of defamatory fact to be actionable for defamation is compelled by the First Amendment to the United States Constitution. See Milkovich, 497 U.S. at 18-20; see also Gray, 221 F.3d at 248.

An important criterion for distinguishing statements of opinion from statements of fact is verifiability, i.e., whether the statement is capable of being proven true or false. See Milkovich, 497 U.S. at 21-22; Piccone, 785 F.3d at 771-72; see also 1 Robert D. Sack, Sack on Defamation § 4.2.4, at 4-22 n.74 (4th ed. 2014) (noting the primacy of verifiability). "Where an expressive phrase, though pejorative and unflattering, cannot be objectively verified, it belongs squarely in the category of protected opinion." Piccone, 785 F.3d at 772 (quotations omitted); see also Phantom Touring, Inc. v. Affiliated Publications, 953 F.2d 724, 728 (1st Cir. 1992) (finding statement that theater production was "a rip-off, a fraud, a scandal, a snake-oil job" to be protected opinion because, in part, there could be "no objective evidence to disprove it"); Catalfo v. Jensen, 657 F. Supp. 463, 468 (D.N.H. 1987) (finding statement that plaintiff was "sleazy" to be expression of opinion because, even assuming the word carried the definition "marked by low ethical standards, . . . it is [not] capable of verification" because "[e]thical standards are inherently subjective"). "The vaguer a term, or the more meanings it reasonably can convey, the less likely it is to be" verifiable and hence actionable. Levinsky's v. Wal-Mart Stores, Inc., 127 F.3d 122, 129 (1st Cir. 1997); see also McCabe v. Rattiner, 814 F.2d 839, 842 (1st Cir. 1987).

Of course, even if a statement is properly described as an opinion, that "does not automatically shield it from a defamation claim. After all, 'expressions of "opinion" may often imply an assertion of objective fact.'" Yohe v. Nugent, 321 F.3d 35, 41 (1st Cir. 2003) (quoting Milkovich, 497 U.S. at 18); see Thomas, 155 N.H. at 339 (explaining that certain statements were not protected because, "even assuming arguendo these statements are opinions, they are clearly based upon undisclosed facts"). At the same time, "even a provably false statement is not actionable . . . when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts." Riley, 292 F.3d at 289 (quotation omitted); see Piccone, 785 F.3d at 772-73 (explaining that, even if statement that plaintiff was "unprofessional" was provably false, it was not actionable because defendant disclosed the facts upon which he based his statement). When the speaker discloses the facts upon which he bases his statement, "no reasonable reader would consider the term anything but the opinion of the [speaker] drawn from the circumstances related." Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1093 (4th Cir. 1993); see also Partington v. Bugliosi, 56 F.3d 1147, 1156 (9th Cir. 1995) (explaining that "[t]he courts of appeals that have considered defamation claims after Milkovich have consistently held that when a speaker outlines the factual basis for his conclusion, his statement is" not actionable for defamation; citing cases).

Furthermore, statements of "imaginative expression" or "rhetorical hyperbole" are generally nonactionable because they "cannot reasonably be interpreted as stating actual facts about an individual." Milkovich, 497 U.S. at 20 (quotation and brackets omitted); see Pease, 121 N.H. at 65 (concluding that

phrase "journalistic scum of the earth" could not reasonably be understood as assertion of fact because the phrase "was no more than rhetorical hyperbole" that "[e]ven the most careless reader must have perceived" was not meant literally (quotation and brackets omitted)); Greenbelt Pub. Assn. v. Bresler, 398 U.S. 6, 13-14 (1970) (concluding that, "as a matter of constitutional law, the word 'blackmail' . . . was not" defamatory as used by the defendant; context of statement made clear that word was used to criticize plaintiff's negotiating position, not to accuse him of literal crime of blackmail). "For better or worse, our society has long since passed the stage at which the use of the word 'bastard' would occasion an investigation into the target's lineage or the cry 'you pig' would prompt a probe for a porcine pedigree." Levinsky's, 127 F.3d at 128. A statement containing arguably hyperbolic language, however, must still be evaluated in its appropriate context to determine whether it could be reasonably construed as asserting or implying the existence of defamatory facts. See id. at 130-32 (statement that "you are sometimes put on hold for 20 minutes—or the phone is never picked up at all" could, when considered in context, be reasonably interpreted as factual assertion); Gray, 221 F.3d at 248-49.

On appeal, the plaintiffs argue that the statements they challenged in their amended complaint are actionable for defamation because they are capable of being proven false or otherwise do not qualify as rhetorical hyperbole. They also argue that, when each challenged statement is considered in context, each can be reasonably understood to imply the existence of undisclosed defamatory facts. In addition, the plaintiffs contend that the trial court could not determine, at the motion to dismiss stage, that the challenged statements were nonactionable. Specifically, the plaintiffs claim their amended complaint alleged that the facts expressed by the defendants, and upon which the defendants relied to support the challenged statements, were false. Finally, the plaintiffs contend that the court erred in dismissing their CPA claims.

Before turning to our analysis of the challenged statements, we make the following observations. The plaintiffs' amended complaint alleges that many of the defendants' statements are defamatory because they refer to ATL as a "patent troll." Generally speaking, "patent troll" is a derogatory phrase used to describe "a class of patent owners who do not provide end products or services themselves, but who do demand royalties as a price for authorizing the work of others." John M. Golden, "Patent Trolls" and Patent Remedies, 85 Tex. L. Rev. 2111, 2112 (2007); see Halo Electronics, Inc. v. Pulse Electronics, 136 S. Ct. 1923, 1935 (2016). Use of the phrase has proliferated in recent years as "[a]n industry has developed in which firms use patents not as a basis for producing and selling goods but, instead, primarily for obtaining licensing fees." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 396 (2006) (Kennedy, J., concurring); see Golden, supra. Despite this uptick in use, "a widely accepted definition of a patent troll has yet to be devised." Golden, supra at 2112 n.7. The term is

6

used by some to refer to any party that doesn't actually produce goods or services. Indeed, some use "troll" to refer to anyone who is suing them . . . . Others would exclude some entities—notably universities and individual inventors—from the troll definition. Still others would limit patent trolls further, to include only . . . companies whose primary line of business is filing patent suits. And even that definition is too broad for some, who would limit the term patent troll to those who assert patents they bought from others, only those who assert invalid patents, or only those who engage in certain "abusive" tactics in patent litigation, such as pressuring allegedly infringing manufacturers by threatening those manufacturers' end-user customers, or seeking nuisance-value settlements.

John R. Allison et al., How Often Do Non-Practicing Entities Win Patent Suits?, 32 Berkeley Tech. L.J. 237, 242 (2017) (footnote omitted); see also Ronald J. Mann, Do Patents Facilitate Financing in the Software Industry?, 83 Tex. L. Rev. 961, 1023-24 (2005) ("[A]ny effort to design a suitable definition of the term 'troll' is likely to lend credence to the view that the status as a troll is in the eye of the beholder. Every firm that has a patent valuable enough to support major [infringement] litigation . . . has acquired that patent from some person who has invested the resources to invent that technology."); Electronic Frontier Foundation v. Global Equity, 290 F. Supp. 3d 923, 946 (N.D. Cal. 2017) (statement that plaintiff "seems to be a classic patent troll" could not give rise to defamation liability because the statement was "an expression of opinion"). Thus, although "patent troll" is generally intended to be disparaging, it would seem that "its meaning is sufficiently elusive to permit application to any of an amorphous number of entities." Golden, supra at 2112-13 n.7.

We are also mindful that the subject of the complained-of statements — patent infringement litigation and the rise of an industry based largely upon such litigation, see eBay, 547 U.S. at 396 — "is one about which there could easily be . . . rational" disagreements, such that we should hesitate to sanction defamation liability for those "who fairly describe[] the general events involved" in a particular controversy "and offer[] [their] personal perspective . . . ." Riley, 292 F.3d at 290 (quotations omitted); see Mann, supra. If such persons were generally liable for defamation, "authors would hesitate to venture beyond 'dry, colorless descriptions of facts, bereft of analysis or insight,' and the threat of defamation lawsuits would discourage 'expressions of opinion by commentators, experts . . . , or others whose perspectives might be of interest to the public.'" Riley, 292 F.3d at 290-91 (quoting Partington, 56 F.3d at 1154).

Against this backdrop, we proceed to analyze the defendants' statements.

III

A

We begin with CUNA's statements. The plaintiffs' amended complaint alleged that statements made by CUNA in September 2013 were defamatory.[3] On September 24, 2013, Robin Cook gave a presentation on behalf of CUNA. The plaintiffs' amended complaint alleged that this presentation was "extremely defamatory" because "it include[d] a derogatory picture of a troll," and because, after describing patent trolls generally, Cook "referred to ATL as a 'well-known patent troll.'" The plaintiffs' amended complaint does not identify any other portions of this presentation as being defamatory. On appeal, the plaintiffs argue that the trial court erred in ruling that CUNA's statement referring to ATL as a patent troll was nonactionable.

The plaintiffs attached a copy of the slideshow which accompanied the September presentation to their amended complaint. We describe the contents of the slideshow to give context to the challenged statement, see Ojo, 164 N.H. at 721; Thomas, 155 N.H. at 338-39, but, like the trial court, we consider the statements alleged to be defamatory to be those specified by the plaintiffs in their amended complaint, see Cluff-Landry, 169 N.H. at 680; see also Riley, 292 F.3d at 291.

The slideshow is titled "Hot Topics in Litigation." It identifies the presenter as "Robin Cook[,] Assistant General Counsel, Special Projects" for CUNA. The next slide contains a cartoon picture of a troll, but no text. The slideshow defines a "patent troll" as "an entity that owns patents and enforces them in an aggressive way with no intention to market the patented invention." It also states that "[p]atent trolls buy or license patents from inventors (often failing/bankrupt companies)," and that patent troll is a "pejorative term – [the] polite term is 'non-practicing entity.'" This slide concludes by acknowledging that "[l]awsuits filed by practicing entities (i.e., companies that actually make stuff) happen too." The slideshow posits that patent trolls make money via infringement litigation, but that "[t]hey seldom actually go to trial (and usually don't want to). Most cases settle." It notes that patent trolls also use "[d]emand [l]etters—[t]hreats of litigation used to strong-arm entities into accepting a license." CUNA says that these letters "target mostly small and medium-sized entities," and equates them with "shakedown[s] – they know that you will pay for a license instead of going to court." (Emphasis omitted.) The slideshow then describes a typical "Demand Letter Scenario," and discusses

---

[3] The plaintiffs' amended complaint also alleged that statements made by CUNA in December 2013 were defamatory. The trial court found that both the September and December statements were nonactionable and dismissed the plaintiffs' defamation claims as to each. On appeal, the plaintiffs do not challenge the trial court's dismissal of its defamation claims as to the December statements. Accordingly, we limit our review to the September statements.

8

why credit unions have been increasingly targeted for litigation as well as the rise of the patent troll problem more generally.

As to specific statements regarding ATL, one slide identifies "Automated Transactions, LLC" as a "Well Known Troll[]." This slide states that ATL "[t]argets all financial institutions within a given area – even ones that don't own or operate ATMs." It also states that the "Federal Circuit has invalidated 7 of [ATL's] 13 patents," and that ATL is "[s]uing many Vermont [credit unions], as well as [credit unions] or community banks in Maine, New York, New Hampshire, and Georgia." The slideshow proceeds to give recommendations as to "What Credit Unions Should Do" to combat patent trolls, and discusses "How to Fight Back," as well as what CUNA is already doing to fight back.

To summarize, the allegedly defamatory statement here is that ATL is a well-known patent troll. According to CUNA's presentation, the use of this term is admittedly "pejorative" and means that ATL "aggressive[ly]" enforces patents it procured from an inventor or company with no intention to market the patented invention(s). The stated bases for CUNA's assertion that ATL is a well-known patent troll are that (1) ATL sends demand letters to all financial institutions in a given area, including those that do not have ATMs, (2) 7 of ATL's 13 patents have been invalidated, and (3) ATL is suing or has sued many banks.

We conclude that the challenged statement, that ATL is a well-known patent troll, is one of opinion rather than fact. As the slideshow demonstrates, the statement is an assertion that, among other things, ATL is a patent troll because its patent-enforcement activity is "aggressive." This statement cannot be proven true or false because whether given behavior is "aggressive" cannot be objectively verified: "[w]hether or not a particular person's behavior may be characterized as" aggressive is "a quintessential expression of personal judgment which is subjective in character." Piccone, 785 F.3d at 772 (quotations and brackets omitted); see Catalfo, 657 F. Supp. at 468. "[I]t means different things to different people[,] and there is not a single usage in common phraseology." McCabe, 814 F.2d at 842 (quotation and ellipsis omitted) ("The lack of precision makes the assertion 'X is a scam' incapable of being proven true or false."); see also Phantom Touring, 953 F.2d at 728 (statements that plaintiff's theater production was "fake" or "phony" could not be objectively verified "since those adjectives admit of numerous interpretations" (quotations omitted)). That CUNA acknowledged the "pejorative" nature of the phrase "patent troll" does not mean it is an assertion of fact rather than opinion. See Piccone, 785 F.3d at 772; see also Masson v. New Yorker Magazine, 832 F. Supp. 1350, 1367 (N.D. Cal. 1993) ("Falsity and defamatory meaning are analytically separate.").

To the extent the plaintiffs argue that CUNA's or the other defendants' use of "patent troll" is one of verifiable fact rather than opinion because those

9

statements were accompanied by a definition of the phrase, we disagree.  As should be apparent from our discussion above, and as the <u>Catalfo</u> court explained, if a challenged statement is defined, but that definition <u>itself</u> "does not have a precise meaning such that it is capable of verification," neither does the challenged statement.  <u>Catalfo</u>, 657 F. Supp. at 468 (even if "sleazy" carried definition of "marked by low ethical standards," it was not "capable of verification" because "[e]thical standards are inherently subjective").  For the reasons explained above, the definition of "patent troll" offered by CUNA cannot be objectively verified.

We further conclude that the challenged statement does not imply the existence of undisclosed defamatory facts.  On the contrary, the facts about ATL upon which the statement is based are clearly stated, as recounted above.  See <u>Thomas</u>, 155 N.H. at 339.  "The courts . . . have consistently held that when a speaker outlines the factual basis for his" or her opinion, he or she is not liable for defamation, <u>Partington</u>, 56 F.3d at 1156, "no matter how unjustified and unreasonable the opinion may be or how derogatory it is," <u>Restatement (Second) of Torts</u> § 566, cmt. <u>c</u> at 173.  <u>See, e.g.</u>, <u>Thomas</u>, 155 N.H. at 339 (explaining that defendant's statements were nonactionable because they were "based completely" on disclosed facts); <u>Chapin</u>, 993 F.2d at 1093 ("Because the bases for the . . . conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related.").  CUNA's statement was accompanied by a "full disclosure of the facts underlying" its conclusion that ATL was a patent troll, and left listeners free to "extrapolate [their] own independent impressions from the information provided" as to whether they agreed that ATL's licensing efforts were aggressive and thus made the company deserving of the label "patent troll."  <u>Piccone</u>, 785 F.3d at 773-74 (quotation omitted); <u>see</u> <u>Pease</u>, 121 N.H. at 66 (concluding that statement was nonactionable because readers could review facts upon which opinion was based to determine whether they agreed with it).  That listeners were free to form their own opinion is underscored by CUNA's acknowledgment in the presentation that infringement lawsuits and demand letters are brought by companies that market their inventions as well as those that do not.  <u>See</u> <u>Riley</u>, 292 F.3d at 294 (opinion not defamatory because author "disclosed the facts upon which the opinion was based, including some facts that are in tension with" the opinion).

The plaintiffs argue that it was "premature" for the trial court to conclude, in ruling upon a motion to dismiss, that CUNA's statement is nonactionable.  They essentially argue that, because they pled facts in their amended complaint that contradict the factual assertions regarding ATL upon which CUNA based its opinion, the court could not conclude that CUNA's opinion did not imply the existence of undisclosed facts.  Specifically, the plaintiffs maintain that, because they pled in their amended complaint that Barcelou "developed and marketed products based on his patented

technology," they were challenging CUNA's implied assertion in its presentation that ATL, like other patent trolls, did not "make stuff." They also assert that, because they pled facts which contradicted CUNA's statement that 7 of ATL's 13 patents have been invalidated, they were challenging the accuracy of that statement as well. The plaintiffs argue that the trial court was required to assume the truth of these assertions, and that the court erred by failing to further assume, based on these assertions, that CUNA's patent troll statement could be reasonably construed to imply the existence of undisclosed facts.

This argument is unavailing. We have consistently held that whether an opinion statement "can be read as . . . implying an actionable statement of fact is a question of law," not of fact. Thomas, 155 N.H. at 338; accord Nash, 127 N.H. at 219; Pease, 121 N.H. at 65. Thus, in analyzing the sufficiency of the plaintiffs' amended complaint, the trial court was not required to assume, based on the plaintiffs' factual assertions, that the challenged statement could be read to imply undisclosed facts, because that is a legal conclusion. See, e.g., Thomas, 155 N.H. at 338-39; see also Sanguedolce, 164 N.H. at 645 (in reviewing a motion to dismiss, the court "need not assume the truth of statements . . . that are merely conclusions of law").

To the extent that the plaintiffs argue that the trial court erred by failing to recognize that the factual assertions regarding ATL which accompanied CUNA's patent troll statement were themselves actionable, we reiterate that the plaintiffs' amended complaint does not include a claim that these assertions constituted defamation. The amended complaint alleges only that CUNA's patent troll statement is actionable for defamation. We have already explained that this statement is not actionable because it was merely an opinion based upon disclosed facts. While the plaintiffs' complaint may take issue with the accuracy of some of these disclosed facts, that does not make the opinion based upon them actionable. "If the defendant bases his expression of a derogatory opinion of the plaintiff on his own statement of false and defamatory facts, he is subject to liability for the factual statement but not for the expression of opinion." Restatement (Second) of Torts § 566 cmt. c at 175 (emphasis added). "The statement of facts and the expression of opinion based on them are separate matters . . . ." Id. cmt. b at 171. While the plaintiffs certainly could have attempted to pursue a theory of defamation liability based on, for example, CUNA's statement that 7 of ATL's 13 patents have been invalidated, they did not do so. See Phantom Touring, 953 F.2d at 728 n.6.

For these reasons, the trial court correctly dismissed the plaintiffs' defamation claim against CUNA.

B

We next turn to ABA's statements. In their amended complaint, the plaintiffs allege that statements made in congressional testimony given by ABA

11

on two separate occasions were defamatory. ABA first testified in 2013, then again in 2014. We begin with the 2013 testimony.

1

ABA gave testimony before the United States Senate Committee on the Judiciary on December 17, 2013. According to the plaintiffs' amended complaint, "[t]he title of the ABA [s]tatement includes the phrase 'limiting patent troll abuse.' The ABA's statement describes ATL's legitimate licensing efforts and then refers to 'patent trolls,' plainly calling ATL a patent troll." It is these "references to ATL as a patent troll" that the plaintiffs alleged were "false and defamatory." The complaint does not allege that any other aspect of ABA's 2013 congressional testimony was defamatory.

The plaintiffs attached a copy of ABA's 2013 testimony to their amended complaint. See Ojo, 164 N.H. at 721; Thomas, 155 N.H. at 338-39; Cluff-Landry, 169 N.H. at 680. The substantive component of ABA's 2013 testimony begins by noting that the association's members "are often end users of technology and the recipients of abusive and deceptive demand letters." ABA notes that "[a]busive patent litigation has been a serious concern for banks . . . across the country." Despite the association's support of legislative reforms aimed at abating such litigation, however, ABA lamented that "the abuses continue and have in fact increased . . . . Banks continue to be barraged by patent assertion entities (PAEs) who use overly broad patents, threats of litigation, and licensing fee demands in an effort to extort payments . . . ." In the face of such threats, ABA said, "many banks, and especially smaller banks, find that their only option is to settle rather than face paying millions to defend against extortive claims of patent infringement."

As to specific statements regarding the plaintiffs, ABA offered the following:

> A recent example of this involves a PAE known as Automated Transactions, LLC (ATL), which targeted banks throughout New England, New York, New Jersey, Georgia, Virginia, Pennsylvania, in addition to an ever-growing number of states. ATL claims that transactions facilitated by the use of the banks' ATMs infringe one or more of its patents. What ATL failed to mention, however, is that several of ATL's claims have been invalidated by courts. In particular, the Supreme Court denied certiorari on ATL's appeal of an April 23, 2012, decision by the Federal Circuit to affirm a ruling by the Board of Patent Appeals and Interferences invalidating several of ATL's patent claims. Despite this, the company continues to assert those patents and sue banks across the country, including banks that do not even have ATMs. While ATL is only one of many different entities that operate as PAEs filing

12

frivolous patent infringement cases against all industries, ATL's tactics and efforts are a prime example of the problem banks and other companies face, primarily with regard to vague and threatening demand letters.

(Footnotes omitted.)  ABA then went on to make additional statements in support of legislative efforts to combat the "abusive litigation" of PAEs and "patent trolls," which ABA appeared to treat synonymously with PAEs.

Similar to CUNA's allegedly defamatory statements, we conclude that the "references to ATL as a patent troll" in ABA's 2013 testimony are expressions of opinion.  Unlike CUNA, ABA did not offer a precise definition of "patent troll" in its testimony.[4]  If anything, though, ABA's failure to specifically define the phrase, coupled with the lack of any concrete common definition, see Golden, supra at 2112-13 n.7, as well as the myriad ways in which its utterers deploy it, see Allison et al., supra at 242, makes it even more difficult for us to "imagine . . . objective evidence that might conclusively prove or disprove it." Levinsky's, 127 F.3d at 130.  Like other, similar pejorative terms, "patent troll" is "quintessentially subjective."  Id.; see, e.g., Piccone, 785 F.3d at 772; Gray, 221 F.3d at 248; Dilworth v. Dudley, 75 F.3d 307, 310 (7th Cir. 1996) (statement calling plaintiff a "crank" was not actionable because it was "just a colorful and insulting way of expressing" disapproval of the plaintiff's work). "[T]he status as a troll is in the eye of the beholder.  Every firm that has a patent valuable enough to support major [infringement] litigation . . . has acquired that patent from some person who has invested the resources to invent that technology."  Mann, supra at 1023-24; see also Electronic Frontier Foundation, 290 F. Supp. 3d at 946.

The plaintiffs appear to argue that ABA's 2013 statement referring to ATL as a patent troll cannot be construed as an opinion because it was made in the context of giving legislative testimony.  According to the plaintiffs, "legislation cannot address an issue that cannot be defined."  We disagree with the plaintiffs' "untenable premise" that all legislative testimony must, ipso facto, consist entirely of factual assertions.  Riley, 292 F.3d at 294.  People can, and regularly do, express their personal opinions before legislatures.

We also conclude that ABA's reference to ATL as a patent troll in its 2013 testimony does not imply any undisclosed facts.  ABA clearly and comprehensively laid out the facts upon which it based its opinion: many banks have received demand letters that claim they are infringing patents; these letters have caused many banks to expend resources; ATL has sent

---

[4] To the extent ABA described characteristics shared by PAEs, which it seemed to treat synonymously with patent trolls, ABA's description did not make its use of either phrase capable of objective verification because, as discussed supra, the descriptions themselves encompassed terms not capable of objective verification.  See Catalfo, 657 F. Supp. at 468.

demand letters; aspects of ATL's patents have been invalidated in court; nevertheless, ATL has continued to assert its patents, send demand letters, and sue banks. See Thomas, 155 N.H. at 339; Phantom Touring, 953 F.2d at 730-31. Nothing about ABA's statement, or the context in which it appears, implies that it is based upon any undisclosed facts; "[o]n the contrary, [ABA] report[ed] in great detail the factual basis for [its] conclusion . . . ." Riley, 292 F.3d at 293. Listeners were free to decide whether they agreed that those facts made ATL a patent troll. See Pease, 121 N.H. at 66. For these reasons, the trial court correctly dismissed the plaintiffs' defamation claim as to ABA's 2013 testimony.[5]

2

The second ABA statement alleged to be defamatory was made on April 8, 2014. On that day, Rheo Brouillard testified on behalf of ABA before a subcommittee of the Committee on Energy and Commerce for the United States House of Representatives. The plaintiffs' amended complaint alleges Brouillard's statements on that date were defamatory in three respects: (1) "[h]e described ATL as a 'patent troll'"; (2) he claimed that ATL extorted payments from banks; and (3) he claimed that ATL's licensing demands cost "nothing more than the price of a postage stamp and the paper the claim is written on." The plaintiffs attached a copy of ABA's 2014 testimony to their amended complaint. See Ojo, 164 N.H. at 721; Thomas, 155 N.H. at 338-39; Cluff-Landry, 169 N.H. at 680.

Brouillard's 2014 testimony on behalf of ABA is similar to ABA's 2013 testimony. For example, he stated that banks "have been inundated by abusive and deceptive patent demand letters by patent assertion entities (PAEs), commonly referred to as 'patent trolls.'" Brouillard testified that "[t]hese patent trolls use overly broad patents, threats of litigation, and licensing fee demands in an effort to extort payments from banks across the country." According to Brouillard, these actions have real costs for banks as well as for society more generally: "it means less capital and fewer resources available for making the loans that drive economic growth." He opined that patent trolls' claims cost "nothing more than the price of a postage stamp and the paper the claim is written on," but that, "when confronted with threats of expensive litigation, many banks" feel pressure to settle "rather than paying millions to defend against extortive claims . . . ."

---

[5] On appeal, the plaintiffs also argue that the trial court erred because additional statements made by ABA in its 2013 testimony were actionable. We reject this argument; as explained supra, the plaintiffs' amended complaint alleged only that ABA's "references to ATL as a patent troll" were defamatory.

As for specific statements regarding ATL, Brouillard stated that the bank for which he worked had been "targeted" by one of ATL's letters. He then gave the "specifics" of his bank's interaction with ATL:

On January 3, 2013, my bank, and more than 30 other banks in Connecticut, received a single page letter . . . from a firm called Automatic [sic] Transactions LLC (ATL). This firm purported that it held a "patent portfolio" which covers the manner in which ATMs communicate over the internet. The letter included an exhibit which simply listed thirteen sets of seven digit numbers . . . . Further[,] it claimed that an investigation had shown that our ATMs operated in a way that made them subject to the patents. It is interesting to note that among the Connecticut banks that received this demand letter, at least one does not operate any ATMs of its own[,] thus drawing into question the validity of the claim of having conducted an investigation.

The letter stated that the sender had sub-licensed to more than one hundred financial institutions the right to continue to operate with the patents. It added that it had thus far brought suit against approximately ten financial institutions where an amicable solution could not be reached and provided a two-week window for resolution.

On January 15, 2013, I wrote back indicating that two weeks was insufficient time to conduct research into the claim and make a decision and noted that, contrary to [ATL's] claim, our ATMs did not operate on the internet but were rather connected to our core IT processor by hard land based phone line. On the 17th of January[,] ATL responded with an offer to extend [its] deadline until February 4, 2013.[6]

Brouillard said that, "[f]or the . . . cost of postage and several pieces of stationary, trolls like this one prey" on banks like his. He said that his bank ultimately refused to settle with ATL once it learned that ATL "had already had its claims overturned in another state," but that had his bank elected to settle it would have cost "$27,000 plus attorney fees, which would have been a needless loss that would have had a real impact . . . ." He went on to outline recommended legislative efforts to combat patent trolls.

We conclude that all three of the statements alleged to be defamatory in the plaintiffs' amended complaint are nonactionable. As for the reference to ATL as a patent troll, that statement is nonactionable for the same reason that the 2013 patent troll statement is nonactionable: it is an expression of opinion

---

[6] Brouillard submitted a copy of the letter his bank received from ATL in support of his testimony.

based on disclosed facts. See Thomas, 155 N.H. at 339; Partington, 56 F.3d at 1156. As to the statements referring to ATL's actions as extortive, we agree with the trial court that these statements are mere "rhetorical hyperbole." Looking at the context of the testimony as a whole, see Morrissette, 122 N.H. at 733, no reasonable listener would understand the reference to extortion to amount to an accusation that ATL had committed a literal crime. See Pease, 121 N.H. at 65; Greenbelt, 398 U.S. at 14 (statement characterizing plaintiff's negotiating position as "blackmail" nonactionable because "[n]o reader could have thought that [the defendants] were charging [the plaintiff] with the commission of a criminal offense"). For example, although Brouillard proposed legislative initiatives to combat patent trolls, the suggested reforms were civil in nature, not criminal. When considered alongside the entirety of ABA's 2014 testimony, "[t]he only reasonable interpretation of the statement is that it was [ABA's] hyperbolic expression of [its] opinion about [ATL] and [its] litigation tactics." Bourne v. Arruda, No. 10-cv-393-LM, 2011 WL 2357504, at *5 (D.N.H. June 10, 2011) (unpublished magistrate decision) (statement that plaintiff's litigation tactics made him a "terrorist[]" found to be nonactionable); see Letter Carriers v. Austin, 418 U.S. 264, 285-86 (1974) (use of "traitor" was "merely rhetorical hyperbole"; context of statement showed that defendant was not levying literal charge of treason).

Regarding the complained-of statement that ATL's efforts cost them only postage and the paper their demand letters are written on, this too is mere rhetorical hyperbole. No reasonable listener, attendant to the statement's context, would have understood ABA to be asserting that ATL's efforts are, in fact, virtually costless. This is demonstrated by, among other things, ABA's acknowledgment in other portions of its testimony that companies like ATL "often file suit" against businesses who choose not to settle, as well as ABA's statement that ATL had indeed brought such suits.

For these reasons, we conclude that the trial court correctly dismissed the plaintiffs' defamation claims against ABA. In light of our conclusion, we need not address ABA's arguments regarding legislative privilege and the fair report privilege.

C

We next address the statements of Stier and Pierce Atwood. The plaintiffs' defamation claims against these defendants are similar to their claims against CUNA and ABA. The amended complaint contends that Stier (an attorney with Pierce Atwood) and/or Pierce Atwood itself defamed the plaintiffs by referring to ATL as a patent troll on several occasions, and by stating that one of ATL's lawsuits was a "shakedown." Almost all of the complained-of statements appear in articles on Pierce Atwood's website. The only one that does not appear on Pierce Atwood's website allegedly appeared in

16

an article on "bizjournals.com."[7]  The articles describe Pierce Atwood and Stier's involvement in defending litigation brought by the plaintiffs, and invite readers who have received demand letters from ATL to contact Pierce Atwood or Stier.

The plaintiffs' appellate arguments with respect to Stier and Pierce Atwood's statements are generally duplicative of their arguments as to CUNA's and ABA's respective statements.  Their arguments pertaining to these two defendants differ from those pertaining to the other defendants in two ways that bear mention.  The plaintiffs contend that the context of Stier and Pierce Atwood's patent troll statements make them actionable because they contain "no language to alert the audience that the statements . . . are expressions of opinion."  However, "the law does not force writers to clumsily begin each and every sentence with" language such as "I think," or "in my opinion," for a statement to constitute an opinion.  Riley, 292 F.3d at 292 (quotation and brackets omitted).  Rather, Stier and Pierce Atwood's patent troll statements are opinions for the same reason that CUNA's and ABA's statements are: whether ATL is a patent troll cannot be "objectively verified."  Piccone, 785 F.3d at 772 (quotation omitted).

In addition, the plaintiffs argue that a certain statement in one of the Pierce Atwood articles implies undisclosed defamatory facts.  Specifically, they argue that "by claiming that ATL 'purposely' kept licensing fees low . . . , Pierce Atwood implies it has a special knowledge of ATL's business strategy," and that this "special knowledge" must have been gained from some investigation, the results of which were not disclosed.  We do not agree that this statement implies the existence of undisclosed facts.  Looking to the publication as a whole, see Morrissette, 122 N.H. at 733, Stier and Pierce Atwood disclosed that they came to this conclusion because "the cost to defend [against ATL's claims in court] was so much greater than the cost to" pay for a license.  Thus, the basis for this statement is disclosed, and no undisclosed facts are implied.  See Thomas, 155 N.H. at 339.

In all other material respects, the plaintiffs' arguments as to Stier and Pierce Atwood do not differ from their arguments as to CUNA and ABA.  Thus, after reviewing the challenged statements of these two defendants as well as the contexts in which the statements were made, we conclude that the patent troll statements are nonactionable because they are opinions that do not imply the existence of any undisclosed facts.  See id. at 338-39.  The "shakedown" statement is nonactionable because it is rhetorical hyperbole akin to ABA's extortion statement.  See Pease, 121 N.H. at 65.  Having so concluded, we need not address Stier and Pierce Atwood's arguments regarding the litigation privilege.

---

[7] The plaintiffs did not attach the bizjournals.com article to their amended complaint, though they did attach the articles appearing on Pierce Atwood's website.

17

IV

We end by briefly addressing the plaintiffs' CPA claims.  The trial court dismissed the plaintiffs' CPA claims because they were "based on the defendants' purportedly false assertions of fact."  Because the trial court concluded that none of the challenged statements were factual, the court dismissed the plaintiffs' CPA claims.  On appeal, the only argument the plaintiffs make with respect to the court's dismissal of their CPA claims is that "[t]he trial court's reasoning . . . is wrong because . . . Defendants' statements about Plaintiffs are factual and thus actionable under [the CPA]."  We have already concluded that none of the challenged statements are factual in nature.  As the appealing parties, the plaintiffs have the burden of demonstrating reversible error.  <u>Gallo v. Traina</u>, 166 N.H. 737, 740 (2014).  Because the plaintiffs have not demonstrated that the trial court committed reversible error in dismissing their CPA claims, we affirm the court's dismissal of those claims.

<u>Affirmed</u>.

LYNN, C.J., and BASSETT and DONOVAN, JJ., concurred.

18